IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| Conrad Little Bear, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| Earl Silk, BIA Superintendent, officially and personally, BIA, Ken Salazar, Secretary, Dept. Of Interior, | ) ) ) | |
| | ) | Case No. 1:11-cv-103 |
| Defendants. | ) | |

This matter is currently before the Court for a review pursuant to 28 U.S.C. § 1915(e)(2)(B). For the reasons set forth below, the undersigned concludes that plaintiff, Conrad Little Bear, has failed to articulate a cognizable federal claim and that this action is therefore subject to dismissal.

## I. BACKGROUND

Little Bear initiated the above-entitled action *pro se* with the submission of a motion for leave to proceed *in forma pauperis* and a complaint. He alleged in his complaint that he "was an employee of the BIA and was wrongfully terminated by the BIA superintendent for retaliatory conduct." Docket No. 1-1. However, he did not identify the date on which his employment with the BIA was terminated, describe with any particularity the events precipitating his termination, or otherwise articulate a statutory or constitutional basis for his claim. Rather, he made an oblique reference to an April 29, 2010, confrontation between himself and Bureau of Indian Affairs ("BIA") Superintendent Earl Silk over his job performance.

An "Incident Report" dated September 29, 2010, was attached to Little Bear's complaint. It stated:

I arrived at the BIA, Agency Office #194 at approximately 2:35 p.m. in Wednesday,

1

September 29, 2010, and started my routine of housekeeping at this building - checking downstairs and then I moved up the 2nd floor lavel (obtained mop and accessories). Shortly thereafter I began to gather the trash from the offices on the 2nd floor. While I gathered the trash several Bureau employees asked about a fight that occurred outside the building between the Superintendent's (Earl Silk) son and a student from the high school. Mr. Silk's son was working at this time in a "temporary" BIA employment status with the ARRA Part if BIA, Facilities Management Branch.

I completed with the 2nd floor and went downstairs and started picking up the trash in Social Services. Jackie (Social Services Administration Assistant) stopped me and asked "If I saw the fight outside", I said no, but I heard about it. I told her earlier when I was at the Fort yates Police Department, I did see him there (Superintendent's son) - answering questions. She then asked me if he got arrested and I told her I didn't know.

During the above discussion the Superintendent was in the work station of Jerilyn White Mountain and he undoubtedly heard what was said. I did not realize that he was in the Social Services office area until I saw him rush out of Ms. White Mountain's office. I proceeded to continue to pick up trash in this office.

At 4:10 my supervisor, Steve Yellow, Facilities Manager, came looking for me and told me to follow him to the Superintendent's office. When we arrived at the Superintendent's office I saw that Mr. Silk was angry as he was pacing back and forth in his office, all the while he was breathing very heavily (a form of venting his anger). He told Steve Yellow to write down the time, then he started to chew me out about this building being filthy. During this episode I stood by the water cooler and <u>he shouted at me to sit down</u>! I looked at him and I said do I have to? Still hyperventilating and in a uncontrollable tone of voice, he spoke loudly and said "I want my office done every day, I looked at him and he had his head down and I said "is this uncontrolled anger all about your son?" He didn't say anything, nor did he respond to my question. I then told him I am the only one cleaning three (3) buildings, he stated he realized that. He then stated, look at the front entrance - it's filthy.

After he got done chewing me out, he was still breathing uncontrollably with heavily breathing and he said no go - get back to work.

The incident at this office took about ten (10) minutes, at 4:30 pm is when I left to continue my job. My supervisor Steve Yellow looked straight ahead and didn't make nay remarks or offer to give my any directive(s).

A few days later (Monday October 4, 2010), I was handed a change of hours which I contested and wrote a separate response to.

2

(Docket No. 1-2) (errors in original).

Also attached to Little Bear's complaint was a letter from Little Bear to the Equal Employment Opportunity Commission ("EEOC") dated September 28, 2011. The letter stated:

> The purpose of this notice is my request for withdraw of EEO hearing per telephonic conference of 9-21-2011.
>
> As I am the aggrieved person, I may bypass the administration complaint and process the file civil action directly in United States District Court provided by EEO upon written notice of intent to sue under the age discrimination in the Employment Act of 1967.

(Docket No. 1-3).[1]

On March 12, 2012, the court issued an order granting Little Bear's motion for leave to proceed *in forma pauperis* and further directing Little Bear to file an amended complaint, opining:

> Little Bear's complaint is deficient to the extent that it does not provide any detail as to when, why, or how his employment was allegedly terminated. The "Incident Report" attached to the complaint is of little help as it says nothing about Little Bear's alleged termination. Rather, it indicates that Little Bear's hours were changed days after his confrontation with Silk on September 29, 2011. [footnote omitted]
> This lack of specificity is problematic in at least two respects. First, the complaint in its present form does not provide defendants with sufficient notice of Little Bear's claim. Second, the complaint does not clearly articulate the legal basis on which Little Bear's claims rest. [footnote omitted]. Thus, Little Bear has not provided defendants fair notice of what his claim or whether his purported right to relief is at least plausible.

(Docket No. 4).

---

[1] A federal employee may, under certain circumstances, appeal his termination to the U.S. Merit System Protection Board (hereinafter the "Board"), an independent executive agency that serves as the guardian of Federal merit systems. A list of actions or decisions that are appealable to the Board, and the laws, rules, and regulations that authorize these appeals, can be found in the Board's regulation at 5 C.F.R. § 1201.3. Discrimination allegations that do not involve actions within the Board's jurisdiction may only be pursued through the employing agency and the EEOC. It is unclear from the facts alleged whether the Board would have jurisdiction over an appeal from Little Bear. In any event, it appears that Little Bear sought recourse with the EEOC.

On September 17, 2012, Little Bear filed a document that contained the following handwritten narrative:

> I believe that I was targeted for retaliatory discharge by my former employer the B.I.A. for the following reasons;
>
> 1. Was asked by another person about his son who or if he got arrested for fight that occurred on the BIA park lot and that the superintendent Earl Silk was in Jerrilyn White Mountain's office which was in hearing distance (see attached)
> 2. I wrote an EEOC complaint on the incident with Earl Silk's and me and sent to Washington D.C. because was avised that another person did an EEOC on Mr. Earl Silk and sent it to Aberdeen S.D. (the regional office) a year or two earlier and nothing was done about it. It stop there in Aberdeen Regional office. a few months later after & wrote the EEO on Mr. Earl Silk he was detailed to the Regional Office (for what reason I don't know). around March or April of 2011 I was in the facilities Management office and Steve Yellow Walks in. There was myself Ernest thunde hawk and Steve Yellow in the office.
>    Steve Yellow stated "well it's official, he can't come back" he referring to the Superintendent Earl Silk (the word on the street that he was to get back to Standing Rocky agency by having people from tribal government talk for him in or to the Aberdeen Regional Office)
> 3. With all of these advserse action's that were out towards me "namely another time in hours change" and due to the fact that I worked in pain "back and both knee's" & kept going to the Indian Health Service Clinilic and put in a request for Workmen's comp. claim which was denied (I really got depressed) that's when they started to work on my discharge from the B.I.A., I got fired to me what seem's like because of disability. unable to proform my duties as janitor. but to date this position has not been filled. in my memo that the B.I.A. sends to me in the mail about my firing states "that they need this position at Standing Rock agency
> 4. had meeting with "acting Supt. Wayne Labelle, and Steve Yellow (Eric Thunder Hawk, Foreman) Clarence Skye
>    have notes on that meeting. was told that I can't go back to work because I mights reinjury my myself as told to me by the shop foreman Ernie thunder Hawk. In my note's the acting Supt. Wayne Laballe asked why I won't reporting to work as stated above by Mr. Ernie thunde Hawk " you might hurt yourself again"
> 5. was told by a former Eldly employee "who also had an incident with Mr. Earl Silk" you were fired because of Earl Silk
> 6. most of the handling of my firing was handled in Aberdeen Regional office human Resources's ofice
> 7. Was advised by Steve Yellow to put in for SSI and Disability Retirement. So I put in for both and currently getting SSI and waiting for disability retirement, and to find out I was fired 4 days before the OPM got my paperwork for disability retirement

   * Fired 8-15-11
* OPM received paperwork 8-18-11
8. Earl Silk and Steve Yellow had a meeting on me on 11-05-10

* * *

Hostile Work Environment

1. Was told I was fired because of Earl Silk - Standing Rock Agency Supt.
2. A. was to by Martin Walker "mainence man" Earnest Thunder hawk "shop Foreman" he sent them to find me and bring that van back because Ernie through I was driving around.
 B. was told by Martin Walker that he was going to take some trash bags which I put in the 2nd floor stairwell for later removal to the dumpster and Ernie told him "don't help him."
 C. was assigned to strip the conference floor room because it is going to be the new records room and instead of using a floor striping compound I used soft scrub. The compound has a very strong smell and soft scrub has a very clean smell to it, and was told by Ernest Thunder hawk to stop using it because it smells bad to someone
 D. was advised by shop foreman that there was a piece of paper in the Supt. Office that has been there for 2 weeks - a person in admin said it sounds like a setup
 E. every time I use the vacuum the 1st floor hallway, the admin secateray would slam her office door
3. the main people who complian are in the investigation report done in the EEOC process in which I a copy and seems to me that these people were pick by someone within Standing Rock agency to give very negitive report's about me
BUT!
they didn't ask any one else who also works in building #19 adminaseration and there is about 40-50 other employee's . . . I could link Earl Silk's actions to may damage (firing)
witness list
1. Steve Yellow - Facilities Manger
2. Jerrilyn White Mountion - Social Worker . . .

Have two Bill's from Dept of Interior B.I.A.
worked in a very hostile work environment

(Docket No. 9) (errors in original). Sandwiched in the middle of the handwritten narrative were four typed pages in which Little Bear briefly recounted his employment history with the BIA, ostensibly summarized the contents of the "Incident Report" that he had filed with his original complaint, and shared that, on February 19, 2012, at 5:30 p.m. he had "observed Steve Yellow in a white Chevy (new) truck turning down a street going N-S down the south side of town where Earl Silk lives."

(Id.).

In addition to the aforementioned document, Little Bear filed a copy of the BIA's "Report of Investigation" (Docket No. 9-1). According to this report, Little Bear had filed an administrative complaint in which he had asserted claims of age and disability discrimination arising out of the decision to change his duty hours on October 4, 2010. (Id.).[2]

On October 9, 2012, Little Bear filed a copy of correspondence he had received from the Office of Personnel Management ("OPM"). This correspondence, dated September 9, 2012, advised that his application for disability retirement under the Federal Employees Retirement System ("FERS") had been approved.

Little Bear also filed a copy of a BIA memorandum on October 9, 212. In the memorandum, Acting Agency Supervisor Dwight Archambault advised that Little Bear was being removed from his position as a custodial worker at the Standing Rock Agency effective August 11, 2011, on account of the fact that his medical condition prevented him from performing critical duties of his position. Archambault then proceeded to summarize Little Bear's medical history along with the myriad work restrictions imposed by Little Bear's physicians. In so doing, Archambault noted that Little Bear had not actually been to work since December 7, 2010, had exhausted all of his annual and sick leave, had been "charged 400 hours of AWOL because of [his] failure to properly request and obtain approval for [his] absences," and had been prescribed medication that precluded him from operating a government vehicle. (Id.).[3]

---

[2] According to the report, Little Bear advised investigators that the relief he was seeking was a disability retirement. (Docket No. 9-1).

[3] At the conclusion of his memorandum, Archambault advised that Little Bear of his right to appeal the BIA's findings–that his medical condition precluded him from performing essential job duties, that there was no reasonable expectation that he would be able to return to work any time soon, and that there were no vacant positions

Little Bear subsequently contacted the court to advise that he was endeavoring to obtain legal assistance with respect to this case. As a consequence, the court held this matter in abeyance.

## II. STANDARD OF REVIEW

Proceedings *in forma pauperis* are governed by 28 U.S.C. § 1915, which provides that the court may authorize the commencement of a suit without prepayment of fees by a person submitting a financial affidavit evincing an inability to pay. See 28 U.S.C. § 1915(a)(1). Notwithstanding financial eligibility, the court may deny an application if it concludes the action is frivolous or malicious, fails to state a claim, or seeks monetary relief against a defendant who is immune from such relief. See 28 U.S.C. § 1915(e)(2) see also McCaslin v. First Nat. Bank of York-Main Branch, 43 F.3d 1182, 1183 (8th Cir. 1994) (stating that "the magistrate or district court judge should determine whether plaintiffs may proceed in forma pauperis in terms of whether the complaint was frivolous and warranted dismissal before ordering the plaintiffs to pay a partial filing fee) (emphasis added); see also Leverett v. Bishop Furniture Co., Inc., 451 F. Supp. 289, 293 (D. S.C. 1978) (opining that "the nature of the cause of action is a legitimate factor to consider in exercising its discretion under § 1915"); cf. Martin-Trigona v. Stewart, 691 F.2d 856, 857 (8th Cir. 1982) (stating with respect to prisoners seeking to proceed in forma pauperis: "There is a two step process to be followed by the district court in considering whether a pro se plaintiff should be permitted to proceed *in forma pauperis*. First, a determination of whether the plaintiff qualifies by economic status under § 1915(a), and, if so, to permit the complaint to be filed. Second, a determination of whether the cause of action stated in the complaint is . . . frivolous or malicious

---

to which he could be reassigned. (Id.). Notably, there is nothing in the materials submitted by Little Bear to indicate whether he ever exercised this right.

7

and, if so, to dismiss the complaint.").

In applying the provisions of § 1915(e)(2), the court must give the *pro se* complaint the benefit of a liberal construction and not dismiss the complaint unless it is clear beyond doubt that there is no set of facts that would entitle the plaintiff to relief. Haines v. Kerner, 404 U.S. 519, 520 (1972) (*pro se* complaints are "subject to less stringent standards than formal pleadings drafted by lawyers"); Atkinson v. Bohn, 91 F.3d 1127, 1128-29 (8th Cir. 1996). While these pleadings requirements are minimal and do not require a detailed recitation of the facts, even a *pro se* litigant must state enough in terms of the facts and grounds for relief to give the defendant fair notice of what the claim is and to indicate that the right to relief is at least plausible, even if the chances for success are remote. See Erickson v. Pardus, 551 U.S. 89, 93-94 (2007); King v. Houston, 556 Fed.Appx. 561, 562-63 (8th Cir. 2014) (unpublished per curiam) (allegations that certain individuals discriminated against plaintiff were too conclusory to state a claim, citing Ashcroft v. Iqbal, 556 U.S. 662, 678–79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) and Stone v. Harry, 364 F.3d 912, 914 (8th Cir.2004)); Carter v. Hassel, 316 Fed.Appx. 525, 526 (8th Cir. 2008) (unpublished per curiam) (allegations insufficient to describe the violation of a constitutional right with respect to certain of the claims); Kozikowski v. C.I.R., 258 Fed.Appx. 60 (8th Cir. 2007) (unpublished per curiam) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007), for the proposition that a complaint must plead enough facts to state a claim for relief that is plausible and dismissing a pro se complaint.

In construing the complaint, the court must weigh all factual allegations in favor of the plaintiff, unless the facts alleged are clearly baseless. Denton v. Hernandez, 504 U.S. 25, 31-33 (1992) (court may disregard factual allegations that are clearly baseless, fanciful, fantastic, or

delusional). "A complaint is frivolous if it lacks an arguable basis in law or fact." Martinez v. Turner, 977 F.2d 421, 423 (8th Cir. 1992) (citing Nietske v. Williams, 490 U.S. 319, 325 (1989)). "It lacks an arguable basis in law if the claim is based on an indisputable meritless legal theory." Id.

## III. DISCUSSION

### A. Retaliatory discharge

Little Bear asserts that he was "was targeted for retaliatory discharge." In so doing, he it takes the position that he was terminated as a result of his encounter with Silk on September 29, 2010.[4]

This claim is frivolous on its face. Little Bear has been afforded ample opportunity to address the deficiencies in his original pleadings. However, other than conclusory allegations, he has presented nothing to date to even remotely suggest that decisions regarding his employment had anything to do with his encounter with Silk or that Silk had any hand in the termination of his employment. What materials he has submitted reveal that the decision regarding his employment was made well after his encounter with Silk by Silk's replacement.

As an aside, it should be noted that Little Bear appears to have qualified for a disability retirement under FERS. According to the supplemental materials filed by Little Bear on October 9, 2012, he submitted an application for disability retirement at the urging of his superiors. On September 12, 2012, he received a letter from OPM advising, inter alia: (1) his application for disability had been approved; (2) that he had not been separated from federal service; and (3) that

---

[4] Little Bear does, in the narrative filed on September 17, 2012, state at one point that he was removed from federal service on account because of a perceived disability. Nevertheless, he has made it abundantly clear his claim as one of retaliatory discharge in "connection of my firing and incident on 9-29-10." (Docket No. 10).

that OPM would notify the BIA that his disability retirement had been approved and further ask that the BIA separate him from federal service. (Docket No. 10).

### B. Hostile Work Environment

Little Bear next asserts that he was subjected to a hostile work environment. In order to state a cause of action for hostile work environment, a plaintiff must allege that: (1) his workplace was permeated with conduct that was "sufficiently severe or pervasive to alter the conditions of her work environment;" and (2) "a specific basis exists for imputing the conduct that created the hostile environment to the employer." Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir.1996). The conduct in question "must be severe or pervasive enough to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.' " Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997). In other words, the first element of a hostile work environment claim requires allegations that demonstrate that the environment was both objectively and subjectively hostile or abusive. See Gregory v. Daly, 243 F.3d 687, 691–92 (2d Cir. 2001).

The basis for Little Bear's claim are stray comments others made about him that he learned of third hand, once instance when he was told not to use a particular floor cleaner, and one incident with a superior who was subsequent transferred. As alleged, this conduct is not sufficiently severe or pervasive enough to constitute a viable claim. See Faragrher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (conduct must amount to something more than simple teasing, offhand comments, or isolated incidents (unless extremely serious)). As a consequence, his claim that he was subjected to a hostile work environment is subject to dismissal for failure to state a claim.

## IV. CONCLUSION

Little Bear has not asserted a cognizable federal claim. As a consequence, this action will

be **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1915(e)(2) unless a paid complaint is filed on or before April 15, 2015.

**IT IS SO ORDERED.**

Dated this 20th day of March, 2015.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court
